**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, :<br><br>Plaintiff,<br><br>v.<br><br>TODAY'S GROWTH CONSULTANT, INC.<br>(dba THE INCOME STORE) and<br>KENNETH D. COURTRIGHT, III,<br><br>Defendants. | Civil Action No. 1:19-cv-08454 |

|  |  |
|---|---|
| MELANIE E. DAMIAN, AS RECEIVER OF<br>TODAY'S GROWTH CONSULTANT, INC.<br>(dba THE INCOME STORE), | ANCILLARY CASE NO. |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | |
| HEARTLAND BANK AND TRUST<br>COMPANY and PNC BANK N.A., | |
| Defendants. | |

## COMPLAINT

Plaintiff, Melanie E. Damian, in her capacity as the Court-Appointed Receiver (the "Receiver") for Today's Growth Consultant, Inc. (dba "The Income Store") in the action titled *Securities and Exchange Commission v. Today's Growth Consultant Inc., et al.,* Case No. 1:19-cv-08454 (N.D. Ill. Dec. 27, 2019 (the "SEC Action") hereby sues Defendants, Heartland Bank and Trust Company ("Heartland") and PNC Bank, N.A., ("PNC"). Plaintiff asserts claims for violations of the Illinois Fiduciary Obligations Act, breach of fiduciary duty, aiding and abetting

breach of fiduciary duty, negligence (in the alternative), fraudulent transfer, and unjust enrichment and alleges follows:

## PROCEDURAL HISTORY

1.      On December 27, 2019, the Securities and Exchange Commission ("SEC") filed an enforcement action against TGC and Kenneth Courtright ("Courtright"), *SEC v. Today's Growth Consultant Inc.,* Case No. 1:19-cv-8454 (N.D. Ill.) [ECF No. 2] (the "SEC Action").  On December 30, 2019, the Honorable Andrea R. Wood entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and an Order Appointing Receiver [ECF No. 19] ("Appointment Order") in the SEC Action.  The TRO ordered all of the Defendants' assets frozen to preserve the *status quo*.  *See* ECF No. 20 at 6-7.  Further, the TRO ordered the preservation of all Defendants' documents, books and records concerning (1) the allegations of the Complaint, (2) any securities offered for sale by Defendant Today's Growth Consultant, Inc. (dba The Income Store) ("TGC")[1], including, but not limited to the Consulting Performance Agreements (the "CPAs"), (3) any communications with, between, or among either Defendant. *See* ECF No. 20 at 7-8.

2.      The Receiver's mandate was to take all actions necessary to implement the terms of the TRO by, among other things, taking possession, custody, and control of all of Defendants' assets, establishing control of TGC's business, ensuring that Defendants' assets were frozen and preventing their withdrawal or misapplication, obtaining and preserving documents and records pertaining to Defendants' assets, transactions and business operations, and performing all acts necessary to protect and preserve the Receivership Estate. *See* ECF No. 19 at 2-4.

---

[1] Capitalized terms herein not otherwise defined are given the definition ascribed to such terms in the Court's Orders.

3.      The Receiver analyzed the business operations, including projected and historic income and expenses and determined that without additional investor funds the operations were not sustainable even in the short term. Even with substantial infusion of investor funds, the TGC/Income Store records indicate a loss in 2018 of $5.7 million and in 2019 of $7.5 million. Indeed, the payroll expense alone exceeded the website/e-commerce revenue.

4.      The Receiver's review of the books and records of the company confirm the SEC's allegations that new investor funds and loans were used to pay the investors/website partners, not website revenue. For example, in 2018 website revenue was under $2 million and website payout to investors was approximately $12.7 million and likewise in 2019 website revenue was under $4 million and website investor payout was $16.5 million.  In short, this was a Ponzi scheme – on the face of the company's own financial statements.

5.      On February 4, 2020, a criminal complaint was filed against Courtright, accusing him of committing wire fraud. *United States of America v. Kenneth E. Courtright,* Case No. 20-CR-77 (N.D. Ill.).

6.      Then, on March 2, 2020, the Honorable Andrea R. Wood entered two separate stipulated preliminary injunction orders in the SEC Action, titled Order Imposing Preliminary Injunction Freezing Assets and Granting Other Relief [ECF Nos. 55, 56] (collectively, the "PI Orders") against each of TGC and Courtright, which shall remain in effect until the Court's determination of the merits of the allegations set forth in the SEC's Complaint or further order of the Court.

## THE PARTIES

### The Receiver

7.      Plaintiff, Melanie E. Damian, was appointed as Receiver over TGC in the SEC Action.  Plaintiff brings this action in her capacity as Receiver, pursuant to the authority granted

by the Honorable Andrea R. Wood in the TRO, Appointment Order, and each of the PI Orders entered in the SEC Action.

**The Defendants**

8.     Heartland is a subsidiary of Heartland Financial, Inc., a community-based financial holding company. Heartland's principal office is located at 401 North Hershey Road, Bloomington, Illinois 61704. TGC and Courtright were customers of Heartland during the entire relevant period during which TGC was operated as a Ponzi scheme, and by 2012 was borrowing money from Heartland to prop up TGC. TGC initiated its direct loan relationship with Heartland in March 2015.

9.     PNC, headquartered in Pittsburgh, Pennsylvania, is the sole domestic subsidiary bank of the PNC Financial Services Group, Inc, a bank holding company headquartered in Pittsburgh, Pennsylvania and incorporated under the laws of the Commonwealth of Pennsylvania. PNC is ranked as the 9th largest bank in the U.S. by assets, the 5th largest by number of locations and 6th largest by deposits. TGC and Courtright opened accounts at PNC in September 2018 when Heartland terminated its banking relationship with them. TGC and Courtright then continued to operate TGC's Ponzi scheme through PNC until the Court entered the December 30, 2019 Appointment Order.

**Non-Party Receivership Defendant Courtright**

10.     Courtright is a Receivership Defendant in the underlying SEC Action resulting from his operation of TGC as a Ponzi scheme. He was an officer and control person for TGC and the authorized signatory in control of each of TGC's bank accounts at Heartland and PNC.

**JURISDICTION AND VENUE**

11.     This Complaint is brought to accomplish the ends sought and directed by the District Court in the SEC Action, which, among other things, appointed Plaintiff as Receiver and

authorized her to commence actions to recover assets of the Receivership Estate. This action is related to the claims in the SEC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a). Therefore, this Court has subject matter jurisdiction over this action.

12.     Plaintiff was appointed as Receiver in this District; the instant Complaint is brought to accomplish the objectives of the TRO, the PI Orders, and the Appointment Order.

13.     This Court has personal jurisdiction over Defendants because Defendants conducted business with TGC, which was operating, conducting, engaging in, and carrying on a fraudulent business or venture in, among other locations, the Northern District of Illinois. The profits and transfers that Defendants received from TGC were proceeds from TGC's fraudulent scheme conducted, in part, in the Northern District of Illinois. TGC is incorporated in Illinois and had its headquarters in Minooka, Illinois.

14.     The Court also has personal jurisdiction over Heartland and PNC because they aided and abetted Courtright in carrying out TGC's Ponzi scheme and misappropriation of investor funds in Illinois.

15.     Venue is proper in the Northern District of Illinois, pursuant to Title 28, United States Code, Sections 754, 1391(b) and 1692, because this action is brought to accomplish the objectives of the TRO, the Appointment Order, and the PI Orders and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate. Further, certain of the acts described in this Complaint occurred in the Northern District of Illinois, and, upon information and belief, victims of TGC's scheme were located in the Northern District of Illinois.

## THE RECEIVER'S STANDING
## TO BRING THE CLAIMS ASSERTED HEREIN

16.     The Receiver has standing to bring the claims asserted in this Complaint pursuant to the TRO, Appointment Order, and PI Orders entered by the Honorable Andrea R. Wood in the SEC Action.  The Receiver's mandate was to, *inter alia*, take possession, custody, and control of all of TGC's assets, establish control of TGC's businesses (to the extent they exist and continue to operate), prevent the withdrawal or misapplication of TGC's funds, collect funds due to TGC, obtain documents and records pertaining to TGC's assets, transactions, and business operations, and perform all acts necessary to preserve the value of the Receivership Estate.  *See* ECF No. 19 at 2-4.

17.     Pursuant to the Appointment Order, the Receiver was directed to "assume and control the operation of Receivership Defendant and shall pursue and preserve all claims or interests of the Receivership Defendant. The Receiver may continue and conduct the business of the Receivership Defendant in such manner, to such extent and for such duration as the Receiver may deem to be necessary or appropriate, if at all." *See* ECF No. 19, at 3.  This includes pursuing claims on behalf of the Receivership Estate.

## FACTUAL ALLEGATIONS

18.     Defendants Heartland and PNC knowingly assisted, aided and abetted, enabled, and facilitated Courtright's fraudulent Ponzi scheme that misused and misappropriated millions of dollars from hundreds of TGC's investors leaving TGC subject to the SEC Action and potentially liable to its investors, all through accounts held at Defendants' banks and with their knowing and willful gross negligent assistance.

19.     TGC's Ponzi scheme was organized and perpetrated by Courtright, TGC's owner and control person, as a result of his fraudulent domination, adverse interest in, and control of TGC

6

and as part of his continued breaches of fiduciary duties to TGC. TGC's only other owner was Courtright's wife.

### Courtright's Fraudulent Scheme

20.     From at least January 2017 through October 2019, TGC and Courtright raised at least $87 million from more than 500 investors who entered into the CPAs pursuant to which the investors would provide up-front payments and ongoing payments in the form of advertising and eCommerce revenues to TGC and TGC promised to pay investors a minimum guaranteed rate of return, in perpetuity, on revenues generated by websites that TGC acquires or builds for the investors and then develops, maintains, and hosts.

21.     Courtright advertised TGC as a company providing expertise in monetizing websites and touted its extensive expertise and skill in identifying profitable websites to be purchased for their investors, building new authoritative websites, and maintaining and growing such websites to generate profits for investors. TGC held discretionary authority on how to invest their investors' money, from selecting the website(s) to purchase or build, developing them as/if needed in their evaluation, and monetizing them.

22.     The CPAs tout TGC's experience and expertise, informing investors that TGC's "growth formulas" with a foundation in page one Google placement as well as a tailored eCommerce strategy would build a bridge to an array of revenue streams for the investor sites.

23.     In particular, under the CPAs, each investor was entitled to the greater of either 50% of their website revenues or a minimum annual guaranteed return (typically ranging from 13% to 20% of the initial investment amount) to be paid monthly, even if the website did not generate sufficient revenue to pay the promised monthly payment.

24.     Further, the Agreements provided that the investor's up-front fee was to be used "exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website…."

25.     And, TGC represented to the investors that it is in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties" and that it is "debt-free . . . with no accounts payable or loans outstanding."

26.     The foregoing representations to investors were false and not supported by TGC's own records. Indeed, the revenue that was generated from the websites each month was significantly less than the monthly payment obligations to the investors and certainly was not sufficient to cover both those monthly payments and TGC's monthly overhead expenses. In addition, despite contrary representations to the investors, the websites and domains with minor exceptions were maintained in the name of, and owned by, TGC and not the individual investors. And, TGC, for at least the past three years, was not solvent or financially able to pay its bills when due (without the improper use of new investor funds) to meet its contractual obligations.

27.     In particular, since at least January 2017, the websites generated approximately $9 million in advertising and product sales revenue, but TGC paid at least $30 million to investors, purportedly pursuant to the Agreements.

28.     TGC was able to cover this significant shortfall primarily by using the up-front payments it received from new or repeat investors who entered into CPAs with TGC, making the business a classic Ponzi scheme. TGC's bank records show that TGC raised approximately $87,647,273.00 from individuals and entities between January 2017 and October 2019.

29.     In 2019 alone, according to the Profit and Losses accounting from the company's records, website income was $3,724,809.00, but TGC paid $16.5 million to investors.  And, TGC

8

generated "revenue" in the form of investments from investors (its largest source of revenue) of approximately $41.5 million and had operating expenses in the amount of $34,653,706, resulting in a net loss of $7,520,873.

30.    Prior years reflect a similar discrepancy in revenues generated from investors in comparison with the amounts paid to investors based upon their investments.

31.    TGC's bank records show that TGC also obtained loans from Defendant Heartland and from distressed lending companies and deposited the loan proceeds into the same TGC bank accounts into which TGC deposited the investor funds (subject to the fiduciary CPAs) and commingled with the revenues from the websites in TGC's Heartland and PNC accounts.

32.    Because most of the websites were not generating sufficient revenues for TGC to pay the amounts due to the investors under the CPAs, TGC covered the significant shortfall primarily by using up-front fees it obtained from new and repeat investors who had entered into CPAs with TGC, and also by using the commingled proceeds of significant loans it received from lenders, to pay the minimum monthly payments it guaranteed to earlier investors under the CPAs, and to make payments towards the loans.

33.    All of this financial misconduct was carried out through bank accounts held with Defendants used to perpetuate Courtright's Ponzi scheme. The Ponzi scheme commenced at the latest in March 2015 when the monthly revenue that was generated from TGC's websites was significantly less than the monthly guaranteed payment obligations to investors and certainly was not sufficient to cover both those guaranteed monthly payments and TGC's monthly overhead expenses.

34.    Further, though TGC may have used subcontractors who shared in website revenue, the CPAs clearly provided that TGC would pay subcontractors only from its 50% share of the website revenue. Heartland and PNC were aware of these facts from their review of the CPAs and

banking transactions.

35.     Based on the SEC's and the Receiver's analysis of TGC's operations and books and records, the business model implemented by Courtright was neither feasible nor profitable. In fact, TGC's business model resulted in significant losses to most of the investors.

36.     Some investors received the return of their full investments plus additional amounts, because they were early investors who received payments over a longer period of time before the commencement of this action or because Courtright chose to pay them more than the amounts due to them under the CPAs.

37.     But the majority of investors received back significantly less than they had invested or nothing at all because they invested closer in time to commencement of this action.

### Preliminary Findings of Fraud Against TGC

38.     As a result of this fraudulent behavior, the SEC commenced the SEC Action against TGC and Courtright that resulted in entry of the TRO and PI Orders containing preliminary findings that TGC and Courtright likely participated in a fraudulent securities scheme.

39.     At all times material hereto, Courtright, as principal and President, controlled and operated TGC as a means to carry out the fraudulent scheme, thereby causing TGC to commit violations of securities laws and rules, common law fraud, and breach of his fiduciary duties to TGC.  TGC was under the control of Courtright until the appointment of the Receiver and thus unable to cease the fraudulent activity and/or seek recovery of the misappropriated funds or fraudulent transfers prior to that point.

**The Insolvency of TGC**

40.     As a result of operating a Ponzi scheme, TGC was insolvent, undercapitalized, and operating at a loss. During all relevant times, TGC did not have sufficient assets to pay its debts to investors and/or creditors as those debts became due.

41.     From March 2015 through October 2019, the websites, collectively, generated revenues that were materially below investor payout amounts guaranteed by TGC. TGC nonetheless paid investors their guaranteed returns, monthly, until December 2019, when it put a moratorium on investor payouts.

42.     Because most investors have not received the return of their investment or all of the amounts due to them under the CPAs, these investors will have significant claims against the Receivership Estate to recover their investments.

**Heartland's and PNC's Involvement in Courtright's Scheme**

**Defendants Carry Out Ponzi Scheme Transfers**

43.     Courtright breached his fiduciary duties to TGC by: (1) knowingly and intentionally operating TGC as a Ponzi scheme; and (2) diverting TGC's funds for his personal benefit, in breach of his fiduciary duty to TGC. Heartland and PNC facilitated both aspects of Courtright's ongoing fraudulent scheme and breaches of fiduciary duties thereby breaching their own fiduciary duties to TGC.

44.     With Heartland's and PNC's assistance, Courtright was able to use new investor funds to satisfy TGC's guaranteed payment obligations to earlier investors. Defendants facilitated the operation of a Ponzi scheme pursuant to Courtright's instructions and transfer orders, which were carried out seemingly without question. Defendants reviewed and processed electronic transfers coming into TGC's accounts earmarked as new investor funds and going out from TGC's accounts as guaranteed payments to earlier investors and to Courtright for personal expenses.

11

45. Nevertheless, Heartland and PNC allowed Courtright to transfer away those funds for improper purposes in breach of the CPAs.

46. Courtright carried out this obvious Ponzi scheme for more than three years, until September 2018, when he confirmed to a Heartland representative that TGC had used and would continue to use new investor funds to cover the shortfall between website revenues and guaranteed investor payouts. Two weeks later, Heartland closed TGC's accounts because they could no longer ignore the Ponzi scheme.

47. As a result, Courtright moved TGC's accounts to PNC in September 2018 where Courtright continued to operate TGC as a Ponzi scheme.

48. PNC allowed Courtright to continue operating his Ponzi scheme without pause despite the suspicious circumstances surrounding the commencement of his banking relationship with PNC. Indeed, PNC had actual knowledge that TGC's longstanding account at Heartland had been abruptly closed and that the SEC was investigating TGC; yet PNC allowed Courtright to perpetuate the Ponzi scheme for 15 more months by allowing TGC to bank at PNC and extending credit to PNC.

### Heartland's Actual Knowledge, Facilitation, and Financing of Courtright's Fraudulent Scheme

#### Heartland's Actual Knowledge of Courtright's Fraudulent Scheme

49. Heartland Vice President Thomas Kentner ("Kentner") served as Heartland's loan officer on all of Heartland's loans to TGC and to Courtright for the duration of TGC's lending relationship.

50. As early as August 2013, Heartland was aware of fact that the investors' money was to be used solely for that investor's website because Kentner had reviewed the July 31, 2003 CPA between TGC and C.M.R. Investments LLC which contained the following provision:

"Today's Growth Consultant shall use the Upfront Fee exclusively for purchasing and initial marketing of the monetized site as well as its conversion to an Authority Site foundation or structure." A second CPA that Kentner had reviewed in August 2013 provided that the Upfront Fee must be used "exclusively for building the Authority Site" of the investor. And, many of those incoming wire transactions from investors specifically stated that the funds being deposited in TGC's Heartland accounts were from investors and were earmarked for a specific purpose -- the purchase, development and management of a website by TGC.

51.     Moreover, through the years, Kentner and others at Heartland were aware that Courtright claimed ownership of the websites even though the CPA Agreements specifically noted that the sites were to be owned by the investors. For example, Courtright claimed on the February 3, 2014 Personal Financial Statement that he delivered to Heartland in order to qualify for his home mortgage at Heartland that he had "bought 4.8MM in websites over last 2 years. They produce at $1MM/yr. I'd value them at 3-5 million at this point." But Heartland knew that TGC's CPA agreements with the investors provided that the investors owned the sites that were purchased. Thus, Heartland knew that TGC had misrepresented to its investors how the monies they invested would be used.

52.     Heartland was aware of TGC's misrepresentation to the investors on the use of investor funds for yet another reason: Heartland knew that Courtright was paying the mortgage he obtained from Heartland on his personal home with funds from TGC's bank account because he had established an automatic transfer between the TGC bank account and his loan account. Heartland also knew that Courtright had transferred funds from the TGC account to the mortgage account that were well beyond the monthly mortgage payments in order to pay down his personal debt and establish collateral in the home, an idea about which Courtright had asked Kentner for

13

advice. In fact, the equity in Courtright's personal residence served as collateral for loans to assist TGC with its "cashflow issues."

53.     Between January 2017 and October 2018, TGC transferred more than $323,000 in mortgage payments to Heartland's mortgage on Courtright's personal residence in amounts that far exceeded Courtright's monthly mortgage obligation. Specifically, as of September 2017, the mortgage loan required monthly principal and interest payments of $2,729, but, between January 2017 and October 2018, Courtright transferred investor funds from the TGC operating account at Heartland to make weekly payments of $3,000 to pay down the Courtright's personal residential mortgage held by Heartland.

54.     Heartland also knew that Courtright was using funds directly from the TGC account into which the investors' funds were placed to pay for personal expenditures such as school tuition for his children and department store credit card accounts. Indeed, the September 30, 2016 ACH Agreement TGC entered into with Heartland listed his children's school, Macy's, and Nordstrom as authorized payees from TGC's operating account.

55.     In addition, at least as early as October 2015, Heartland was aware that TGC was guaranteeing payments to the investors. For example, an October 6, 2015 CPA guaranteed that the $150,000 investor would receive an "irrevocable, non-recoverable draw" of $2,500 per month for the first year, $3,125 per month for the ensuing year, and $4,166 per month "in perpetuity" thereafter. Another September 17, 2015 CPA made the same guarantees to another $150,000 investor of a stepped-up monthly "irrevocable draw" that would continue "in perpetuity."

56.     Also at least as early as October 2015, Heartland was aware that TGC included pending investor payments in its accounts receivable and, at least as early as June 2016, that investor payments greatly outpaced advertising revenue from the websites.

14

**Heartland's Facilitation and Financing of Courtright's Scheme**

57.     In addition to facilitating Courtright's misappropriation of TGC's earmarked funds as described *supra*, Heartland provided critical financing, in the form of loans and lines of credit that were extended in contravention of standard banking practices, without which Courtright's Ponzi scheme could not have been carried out and/or perpetuated. Indeed, Heartland made loans and extended credit even after it had actual knowledge that TGC's guaranteed investor payouts were being made with up-front payments from new investor, due to significant shortfalls in website revenues and that Courtright was misusing TGC's funds for personal expenses, in breach of his fiduciary duties to TGC.

58.     Heartland's financing allowed TGC to continue operating from March 2015, when Heartland started financing Courtright's fraudulent scheme, until all of TGC's accounts at Heartland were closed in October 2018.

59.     Heartland, through Kentner, reviewed TGC's various loan applications for the loans described below and analyzed TGC's financial statements provided in support thereof. Kentner also communicated with Courtright and other officers of TGC to gather additional information required for Heartland to approve the significant financing that TGC requested. Courtright provided Heartland with detailed information concerning TGC's business model regarding collecting the up-front fees that were used for website development for revenue generating websites.

60.     As Courtright repeatedly applied for loans and credit, he disclosed TGC's troubled financial situation to Heartland. In June 2015, Courtright specifically informed Heartland that TGC had a "cash-flow" shortfall.

61.     Upon review and analysis of detailed financial information from TGC, Heartland memorialized its analysis and opinions of TGC's credit worthiness in credit memos that were used

to determine whether to approve or deny TGC's loan requests and to set the terms for the many loans and extensions of credit that Heartland provided to TGC.

62.     In March 2015, **Heartland provided a 30-day loan, intended to cover a cash-flow shortfall, to TGC in the amount of $66,886.00.** In June 2015, Heartland provided another 30-day loan, also intended to cover a cash flow shortfall, to TGC in the amount of $90,000.00. In July 2015, Heartland granted TGC a $200,000.00 revolving line of credit to fund accounts receivable that matured in 1 year and was renewed in July 2016. By April 2017, TGC had drawn $180,000.00 of that $200,000 line of credit. Courtright then informed Heartland that TGC would like to increase that line of credit to $500,000 to eliminate the need for short-term loans in addition to the line of credit.

63.     When that line of credit matured again in August 2017, Courtright requested another renewal which required that Courtright provide Heartland with TGC's current financial statements.

64.     In connection with the credit approvals, TGC provided to Heartland financial documents that showed that the bulk of TGC's operating income came from the upfront fees paid by the investors and not from actual revenues from the websites. Moreover, the accounts receivable reports TGC provided to Heartland reflected that the vast majority of the receivables were anticipated investor up-front payments. Again, such documents revealed the Ponzi scheme on their face.

65.     In August 2017, Courtright represented to Heartland that TGC had recently hired new accountants that were in the process of updating TGC's 2016 and partial year 2017 financial statements.

66.     Heartland claimed it "was not comfortable" renewing the line of credit for a full another year without review of the updated financials and additional information regarding TGC's

business plan. Nevertheless, in August 2017, Heartland renewed TGC's line of credit for three more months. And then, without receiving TGC's updated financials, Heartland renewed TGC's line of credit three more times, for a total of nine months.

67. In order to obtain the initial three-month extension of the credit line, Courtright provided Heartland with copies of certain CPAs that TGC had recently entered into. According to those CPAs, TGC was entitled to 50% of website revenue and provided the investor with guaranteed payments even if the website revenues were not sufficient to cover those payments.

68. The CPAs that TGC provided to Heartland in mid-2017 showed that TGC received a lesser percentage of website revenue than Courtright had represented to Heartland. The CPAs also showed that TGC's funds held in the Heartland account came from selling the CPAs to investors and that those investment funds were earmarked for the purchase, development, and maintenance of websites and could only be used for those purposes.

69. Finally, on August 7, 2018, when TGC provided Heartland with updated financial statements for 2017 and for January through July 2018, they showed that TGC was operating at a loss of more than $2 million for the year. They also showed that for 2017 website revenues were less than $3 million combined, while guaranteed payments were more than $8 million. The income from investors, labeled as "development income," exceeded $16 million. For 2018, website revenues to date were less than $600,000 combined, while guaranteed payments to investors were more than $6 million, and the income from investors, again labeled as "development income," exceeded $16 million.

70. It was obvious from TGC's financial statements that TGC could not have made the guaranteed payments to investors in the amounts that were reflected in TGC's profit and loss statements without using income from investors intended for development of new websites.

71.     On August 29, 2018, Joe Brock of Heartland participated in a conference call with TGC's Controller where Brock stated Heartland's observation that TGC's revenue for 2018 was on pace to decrease 74%, while its financial obligations to investors were on pace to increase by approximately 36%. TGC's Controller then informed Heartland that if TGC's revenue was insufficient to cover the guaranteed payments, TGC used incoming money from new investors to make those payments -- confirming to Heartland that TGC was operating a Ponzi scheme.

72.     On September 10, 2018, Kentner, Courtright, and Don Funk of Heartland met to discuss Heartland's concerns with extending the line of credit.  At that meeting, Courtright again confirmed that TGC would *continue* to make the guaranteed payments using incoming funds from new investors to cover the revenue shortfall articulated that Courtright's use of funds from new investors to make the guaranteed payouts made them "uncomfortable" and "decided to terminate its banking relationship with TGC" and terminated the banking relationship with TGC on September 14, 2018; of course, this was too little too late.

73.     Notwithstanding all of these flashing red warning signals, Heartland provided the Courtrights with a mortgage loan on a condominium in Chicago Illinois in July 2018. And then, Heartland provided the Courtrights with a refinancing mortgage loan on the Minooka, Illinois residence in October 2018 – after Courtright orally confirmed that he had been operating a Ponzi scheme through TGC and using TGC's funds to pay the Courtrights' prior mortgage loan with Heartland on that residence, as well as using the equity in that residence as collateral for TGC's loans to cover cashflow issues. And, even after Heartland discontinued its banking relationship with TGC, it continued to accept payments of investor funds from the Courtrights and TGC for these mortgages.

74.     Thus, it is clear that as a result of the borrower-lender relationship between Heartland and TGC, Heartland had copies of the CPAs, of TGC's and Courtright's financial statements and tax returns, of TGC's business plans, and access to TGC's officers from whom it obtained additional information as needed. All of that information dating back to 2015 resulted in credit memos analyzing TGC's poor financial condition, such that Heartland had actual knowledge that Courtright was operating TGC as a Ponzi scheme and/or Heartland, in bad faith, ignored the overwhelming evidence of Courtright's breaches of fiduciary duty to TGC.

<strong>PNC's Actual Knowledge of Courtright's Fraudulent Scheme</strong>

75.     Courtright and TGC came to PNC after being terminated from Heartland, which PNC knew or should have known.

76.     From TGC's PNC account, Courtright continued to cover the shortfall between website revenues and the guaranteed payments with new investments, and PNC carried out all of Courtright's funds transfer instructions even though they were in violation of the CPAs that were in PNC's possession.

77.     PNC's basic review of TGC's account showed PNC that Courtright was receiving funds from investors specifically earmarked for purchases and development of websites. Specifically, in PNC's October 22, 2018 Credit Approval Memorandum, which authorized an extension of $1.5 million in ACH exposure, the Business Description made it clear that TGC was entering into partnerships with investors and, thus, that TGC would have a fiduciary duty to handle the funds it received from these partners appropriately and not for the Courtrights' benefit.

78.     With knowledge of the CPAs, it was clear that Courtright was misusing and misappropriating those investor funds for his own personal purposes and to make Ponzi payments to earlier investors. Rather than prohibit such misconduct, PNC executed Courtright's improper

instructions and aided and abetted in the misappropriation of over a million dollars in TGC's funds, even extending a line of credit in order to facilitate and continue the breaches of duty and fraud.

79.     PNC knew that TGC's new investor funds were being commingled with nearly $12 million in loan proceeds and that TGC paid guaranteed returns to existing investors from commingled funds. This contradicted what PNC knew to be TGC's stated business model. Commingling of funds is a hallmark of a Ponzi scheme, particularly where that commingling fails to comport with a customer's business purpose.

80.     As part of the process of opening the TGC operating account and the Courtright's personal accounts, on September 26, 2018, Michael Postupak, PNC's Senior Vice President and relationship manager for TGC, was notified that Kerri Courtright wanted her personal bank account to automatically draw $2,500.00 from TGC's operating account any time the balance reached $1,500.00 in the personal account. Thus, PNC knew that the Courtrights were treating the TGC operating account as their personal piggy bank.

81.     In May 2019, TGC began using distressed lending companies to fund its ongoing shortfall; it received large loans totaling approximately $12 million and deposited the funds into its PNC account. At the same time, TGC also continued to raise funds through the offer and sale of CPAs. TGC commingled investor funds with loan proceeds in Defendant PNC's account, and instructed PNC to use the co-mingled funds to both make payments to investors and to repay its loans – both inappropriate uses of TGC's revenue from investors under the CPAs. Nevertheless, PNC obliged Courtright and carried out his instructions allowing him to misappropriate TGC's funds and leaving it further indebted to its investors.

82.     In or about early 2019, PNC learned that TGC was being investigated by the SEC. Nevertheless, PNC continued to carry out Courtright's improper banking transactions -- accepting

deposits of millions of from TGC's investors and allowing Courtright to misappropriate those funds.

83.     PNC had actual knowledge that: (1) the deposits from new TGC investors were followed by transfers of those deposits to existing TGC investors as distribution payments, and (2) Courtright misused investor funds to pay personal expenses including his children's private school tuition, his tax and credit card bills, Kerri Courtright's college tuition, department store purchases, the Courtrights' personal mortgages (which were held by Heartland), and numerous other obviously personal expenses, ranging from luxury items to personal services.

**PNC's Facilitation and Financing of Courtright's Scheme**

84.     Even after PNC learned of the SEC's investigation of Courtright and TGC, it continued to do business with them, accepting new investor funds until the commencement of the SEC Action.

85.     PNC extended credit to TGC on four separate occasions, at least one of which (expanding the existing $1.5 million ACH exposure to $2.1 million) took place after it knew the SEC was investigating Courtright and TGC. This allowed TGC to continue the Ponzi scheme for an additional fifteen (15) months.

86.     Despite "know your customer" obligations, its duties to TGC as a customer, and its actual knowledge of thousands of improper transactions coming out of TGC's accounts, PNC continued to provide TGC and Courtright with the banking relationships needed to carry out Courtright's fraudulent scheme. Indeed, PNC had actual knowledge that Courtright was operating TGC as a Ponzi scheme and/or PNC, in bad faith, ignored the overwhelming evidence of Courtright's breaches of fiduciary duty to TGC.

**The Receiver's Right to Bring These Claims**

87.     Plaintiff, the Receiver for TGC, did not and could not have discovered the facts constituting Heartland's and PNC's misconduct until after her appointment as Receiver in the SEC Action on December 30, 2019. And, TGC could not have stopped Courtright's or Heartland's and PNC's misconduct until it was out from under Courtright's adverse dominion and control upon the appointment of the Receiver. Thus, the claims asserted herein did not accrue until that date and any applicable statutes of limitations were tolled until that date.

88.     All conditions precedent to filing this Complaint have been met.

## COUNT I
**Violation of the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. § 65/1 et seq.**
**(Against Heartland and PNC)**

89.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 88.

90.     Heartland and PNC owed a fiduciary duty to TGC as their banking client.

91.     Heartland and PNC knew that Courtright also owed a fiduciary duty to TGC as its officer, director, and/or control person.

92.     Heartland and PNC knew that TGC entered into CPAs with its investors and as a result was in possession of investor funds with which TGC was contractually obligated to purchase, build, and maintain websites for its investors.

93.     Heartland and PNC knowingly processed checks and wire transfers from investors, which were earmarked for investment in TGC for the purchase, development, and maintenance of websites, that were deposited into the accounts that TGC maintained at Heartland and PNC.

94.     Heartland and PNC knowingly followed Courtright's instructions to transfer TGC's funds for his own personal use and misuse in breach of the CPAs.

95.     Courtright breached its fiduciary duty to TGC through the use of those funds for

personal benefit and for an unlawful purpose and by operating a Ponzi scheme through TGC, all of which was known to Heartland and PNC.

96.    Heartland and PNC had actual knowledge of Courtright's breaches of fiduciary duty to TGC. Heartland and PNC knowingly accepted TGC's deposits of funds into accounts maintained at Heartland and PNC via wire transfer and check deposit and then knowingly allowed Courtright to misuse those funds. Indeed, Heartland and PNC knew, as alleged herein, that: TGC's business, as operated by Courtright, was not sustainable; TGC was paying investor payouts with new investors' up-front funds and commingled investor funds and loans; the investor payouts far exceeded revenue from websites; the websites generated little or no revenue; and Courtright was transferring funds from TGC's business accounts to his personal account for payment of personal expenses such as his Heartland mortgage, private school tuition, and personal credit card charges.

97.    Heartland and PNC's actual knowledge came from: (i) their manual processing of all investor wires into TGC's accounts many of which were label as investor funds, including in some instances money coming from investment and/or pension accounts; (ii) their regulatory "know your customer" and customer due diligence obligations which remained in place throughout the banking relationship with TGC and Courtright; (iii) the processing of a high volume of transactions between and among TGC, Courtright and TGC's investors reflecting a large amount of  incoming new investor payments and outgoing Ponzi-like payments to earlier investors and to Courtright for personal expenses; (iv) their review of the CPA's which proscribed used of the investor funds for limited purposes, which was not adhered to by Courtland and TGC; (v) through extension of credit which facilitated Courtright's Ponzi scheme, ongoing fraud, and breaches of fiduciary duty against TGC to continue, which lending relationship provided them with in depth information on TGC's business and financial operations; and (vi) in the case of Heartland,

23

benefitting from the scheme by knowingly allowing the Courtrights' personal mortgages held by Heartland to be paid with investors' funds.

98.     In the alternative, Heartland and PNC acted in bad faith because it was clear that Courtright was repeatedly breaching his fiduciary duty to TGC, yet the Defendants deliberately refrained from closing TGC's accounts and/or refusing to carry out the transactions that were obvious breaches of Courtright's fiduciary duties. In doing so, Heartland and PNC acted in a commercially unjustifiable manner because, among other things, they either knew or disregarded and refused to learn facts readily available to them that indicated Courtright was breaching his fiduciary duty to TGC. Heartland and PNC willfully preserved their ignorance of readily available facts concerning Courtright's operation of a Ponzi scheme by failing to make any reasonable inquiry into TGC's and Courtright's obviously suspicious banking transactions and blatant misuse of investor deposits in order to maintain a profitable business relationship with TGC.

99.     Indeed, Heartland and PNC earned such significant profits from their relationship with Courtright and TGC that they knew or chose to ignore Courtright's misconduct and failed to prevent it in any way. That choice to look the other way amounts to bad faith.

100.    The actual and foreseeable result of PNC's and Heartland's bad faith was the loss of TGC's funds and business operations that TGC has suffered and will continue to suffer as a result, including amounts for which TGC will be liable to its investors for which it has insufficient funds.

**COUNT II**
**Breach of Fiduciary Duty**
**(Against Heartland and PNC)**

101.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 88.

102.    Heartland and PNC each owed a fiduciary duty to TGC pursuant to their bank/client relationship.

24

103. Heartland and PNC were on actual or inquiry notice that Courtright was carrying out the misappropriation and/or diversion of TGC's funds and that such misconduct was ongoing.

104. Heartland and PNC knowingly breached their fiduciary duties to TGC by: (i) following Courtright's instructions to transfer out TGC's new investor funds to make guaranteed payments to earlier investors, thereby allowing Courtright to operate a Ponzi scheme through TGC; (ii) allowing Courtright to misappropriate TGC's funds by using them for payment of clearly personal expenses including, payment of the Courtright's mortgages held by Heartland and transfers to Courtright's relatives and insiders; (iii) providing financing and credit to TGC that allowed Courtright to perpetuate the fraudulent scheme; (iv) in PNC's case, knowingly allowing Courtright to commingle distressed loan proceeds with TGC's investor funds and to use those funds for improper purposes under the CPAs; and (v) failing to or refusing to fulfill their "know your customer," due diligence, and other banking regulations and standard practices including, failing to implement and adhere to compliance and monitoring protocols concerning Courtright's use of TGC funds.

105. As a direct and proximate consequence of the conduct of Heartland and PNC, TGC has been damaged and continues to suffer damages.

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Heartland and PNC)

106. Plaintiff re-alleges the allegations set forth in paragraphs 1 through 88.

107. During the relevant period, Courtright was TGC's Chief Executive Officer and owner of TGC, along with his wife.

108. During the relevant period, Courtright had sole or nearly sole control over TGC and was the signatory on the Heartland and PNC bank accounts subject of this lawsuit.

109. During the relevant period, Courtright knowingly and intentionally engaged in a

scheme using TGC against its own interests to defraud its investors, thereby breaching his fiduciary duties to TGC.

110.     During the relevant period, Courtright misappropriated TGC's funds held at both Heartland and PNC banks for personal use and for improper purposes under the CPAs.

111.     Heartland and PNC substantially assisted Courtright's breaches of fiduciary duty to TGC by carrying out his instructions to misappropriate TGC's funds, by allowing him to use TGC's bank accounts to carry out a Ponzi scheme, and by providing critical financing to allow Courtright to perpetuate the Ponzi scheme and prevent TGC's collapse.

112.     Heartland and PNC's actual knowledge came from: (i) their manual processing of all investor wires into TGC's accounts many of which were label as investor funds, including in some instances money coming from investment and/or pension accounts; (ii) their regulatory "know your customer" and customer due diligence obligations which remained in place throughout the banking relationship with TGC and Courtright; (iii) the processing of a high volume of transactions between and among TGC, Courtright and TGC's investors reflecting a large amount of  incoming new investor payments and outgoing Ponzi-like payments to earlier investors and to Courtright for personal expenses; (iv) their review of the CPA's which proscribed used of the investor funds for limited purposes, which was not adhered to by Courtland and TGC; (v) through extension of credit which facilitated Courtright's Ponzi scheme, ongoing fraud, and breaches of fiduciary duty against TGC to continue, which lending relationship provided them with in depth information on TGC's business and financial operations; and (vi) in the case of Heartland, benefitting from the scheme by knowingly allowing the Courtrights' personal mortgages held by Heartland to be paid with investors' funds.

113.    Despite such knowledge, Defendants knowingly participated in and provided substantial assistance to Courtright's breaches of fiduciary duties by, among other things: (i) following Courtright's instructions to transfer out TGC's new investor funds to make guaranteed payments to earlier investors, thereby allowing Courtright to operate a Ponzi scheme through TGC; (ii) allowing Courtright to misappropriate TGC's funds by using them for payment of clearly personal expenses including, payment of the Courtright's mortgages held by Heartland and transfers to Courtright's relatives and insiders; (iii) providing financing and credit to TGC that allowed Courtright to perpetuate the fraudulent scheme; (iv) in PNC's case, knowingly allowing Courtright to commingle distressed loan proceeds with TGC's investor funds and to use those funds for improper purposes under the CPAs; and (v) failing to or refusing to fulfill their "know your customer," due diligence and other banking regulations and standard practices including, failing to implement and adhere to compliance and monitoring protocols concerning Courtright's use of TGC funds.

114.    As a direct and proximate result of Defendants' aiding and abetting of breach of fiduciary duty, TGC has been damaged and continues to suffer damages.

### COUNT IV
**Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1)**
**(Against Heartland)**

115.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 88.

116.    This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

117.    Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or

incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor;

740 ILCS § 160/5(a)(1).

118.     The Receiver acting on behalf, and standing in the shoes, of receivership entity TGC has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright transferred from TGC to investors and/or creditors pursuant to the actual fraud prong of the statute. 740 ILCS § 160/5(a)(1).

119.     TGC's transfers to Defendant Heartland were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay, or defraud the creditors of TGC.

120.     In particular, as detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused the transfer of at least $512,449.33 in fraudulent transfers to Defendant Heartland with actual intent to hinder, delay, or defraud TGC's creditors.

121.     Defendant Heartland received the transfers without providing reasonably equivalent value in exchange for the transfers.

122.     At the time that TGC made the transfers, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

123.     TGC made the transfers in furtherance of that fraudulent scheme and Ponzi scheme.

124.     At the time that TGC made the transfers, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

125.     TGC made the transfers at Courtright's direction, as a result of his fraudulent domination, adverse interest in and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

126.     Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the Transfers to delay, hinder, or defraud TGC's creditors.  Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

127.     Because the Transfers were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

128.     As a direct and proximate result of TGC's fraudulent transfers to Defendant Heartland, the Receivership Estate has been diminished in the amount of at least $512,449.33, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Heartland: (1) determining that the transfers from TGC to Defendant were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant, in the full amount of the transfers received by Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

<u>**COUNT V**</u>
**Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(2)**
**(Against Heartland)**

129.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 88.

130.    Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS § 160/5(a)(2).

131.    The Receiver acting on behalf, and standing in the shoes, of TGC has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that TGC made to Defendant Heartland pursuant to the constructive fraud prong of the Act. 740 ILCS 160/5(a)(2).

132.    The transfers to Defendant Heartland were made without TGC receiving reasonably equivalent value in exchange for the transfers or obligations incurred.

133.    Also, the transfers occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when TGC intended to incur or believed, or reasonably should have believed that TGC would incur debts beyond its abilities to pay as they became due.

30

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant: (1) determining that the transfers from TGC to Defendant were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant, in the full amount of the transfers received by Defendant Heartland, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

### COUNT VI
**(Unjust Enrichment as to the Transfers)**
**(Against Heartland)**

134.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 91.

135.    TGC conferred a benefit on Defendant Heartland when it made the transfers to them in the amount of at least $512,449.33, all of which were derived from the fraudulent scheme orchestrated by Courtright through TGC.

136.    Defendant Heartland had knowledge of the benefit they received from TGC as a result of the transfers and voluntarily accepted and retained the benefit conferred.

137.    It is inherently unfair and inequitable violating fundamental principles of justice, equity, and good conscience that the funds of investors defrauded in TGC's fraudulent scheme are retained by and used to personally benefit Defendant Heartland (who knew or should have known of TGC's fraudulent scheme), rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and/or creditors.

138.    As a direct and proximate result of Heartland's retention of at least the $512,449.33, that TGC fraudulently transferred to them, the Receivership Estate has been diminished, and, under the circumstances, equity dictates that Heartland should return the funds received from TGC and

turnover any assets they may have acquired with those funds to the Receiver for the benefit of all of the defrauded investors and/or creditors.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Heartland: (1) determining that the transfers from TGC to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant, in the full amount of the transfers received by Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff as the Receiver for TGC demands judgment:

(a)     awarding damages on each claim in an amount to be established at trial;

(b)     voiding the transfers made to Heartland Bank and ordering the return of the sum of the transfers to the Receiver for the benefit of the Estate; and

(c)     granting such other relief as to this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.


Dated: December 30, 2020                     Respectfully submitted,

                                      */s/  Kevin B. Duff*
                                      Kevin B. Duff (kduff@rdaplaw.net)
                                      Ill. Bar No. 6210491
                                      Rachlis Duff & Peel, LLC
                                      542 South Dearborn Street, Suite 900
                                      Chicago, Illinois 60605
                                      Telephone: (312) 733-3950
                                      Facsimile: (312) 733-3952

                                      *Counsel for Plaintiff Melanie E. Damian,*
                                      *Court-Appointed Receiver*


                                      KENNETH DANTE MURENA, Esq.
                                        Florida Bar No. 147486
                                        Email: kmurena@dvllp.com
                                      THOMAS CULMO, Esq.
                                        Florida Bar No. 775479
                                        Email:  tom@culmotrialattorneys.com
                                      DAMIAN & VALORI LLP
                                      1000 Brickell Avenue, Suite 1020
                                      Miami, Florida 33131
                                      Telephone: (305) 371-3960
                                      Facsimile: (305) 371-3965

                                      *Counsel for Plaintiff Melanie E. Damian,*
                                      *Court-Appointed Receiver*
                                      *(Applications for Admission to the Northern*
                                      *District of Illinois are forthcoming)*