UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELANIE DAMIAN, as Receiver of )
Today's Growth Consultant, Inc. )
(dba The Income Store), )
 )
            Plaintiff, )
 )           No. 20 C 7819
      v. )
 )           Judge Sara L. Ellis
HEARTLAND BANK AND TRUST )
COMPANY and PNC BANK N.A., )
 )
            Defendants. )

## OPINION AND ORDER

The U.S. Securities and Exchange Commission ("SEC") filed a case against Today's

Growth Consultant Inc. ("TGC"), alleging that TGC and its owner, Kenneth D. Courtright III,

engaged in a Ponzi scheme that defrauded investors. In connection with those proceedings, the

court appointed Melanie Damian as TGC's Receiver, authorizing her to bring lawsuits to recover

assets of the Receivership Estate. The Receiver then filed this action against two banks with

which TGC and Courtright had accounts, Defendants Heartland Bank and Trust Company

("Heartland") and PNC Bank N.A. ("PNC"). In her amended complaint, the Receiver alleges

that Heartland and PNC violated their obligations under the Illinois Fiduciary Obligations Act

("FOA"), 760 Ill. Comp. Stat. 65/1 *et seq.*, breached their fiduciary duties, and aided and abetted

Courtright's breaches of fiduciary duty. The Receiver also claims that Heartland violated the

Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 Ill. Comp. Stat. 160/1 *et seq.*, and was

unjustly enriched by its receipt of payments from TGC for Courtright's home mortgage.

Heartland and PNC have filed motions to dismiss the amended complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6).[1]  Because the Receiver's allegations do not support an inference that PNC allowed Courtright to misappropriate investor funds with actual knowledge or in bad faith, the Court dismisses all claims against PNC with prejudice.  But because the Receiver has sufficiently alleged bases to hold Heartland liable for its actions in facilitating Courtright's wrongful conduct, the Receiver may proceed against Heartland on her affirmative FOA claim, as well as the aiding and abetting claim with respect to Heartland's actions on or after September 10, 2018, when Heartland learned of the Ponzi scheme.  The Receiver also has sufficiently pleaded her IUFTA claims against Heartland, but she has not set forth a sufficient basis for the unjust enrichment claim.

**BACKGROUND**[2]

## I.     Overview of TGC's Investment Scheme

TGC, also known as The Income Store, claimed it would provide investors with a guaranteed rate of return through revenues it generated from websites it built and acquired. Courtright served as TGC's principal and president, with controlling authority over TGC.

TGC advertised its investment opportunities by touting its expertise in monetizing websites.  Interested investors entered into Consulting Performance Agreements ("CPAs") with TGC.  Between January 2017 through October 2019, TGC raised at least $87 million from over

---

[1] In her responses to the motions to dismiss, the Receiver agrees to withdraw the breach of fiduciary duty claim (Count II), and so the Court does not discuss this claim further.

[2] The Court takes the facts in the background section from the Receiver's amended complaint and the exhibits attached thereto and presumes them to be true for the purpose of resolving Heartland and PNC's motions to dismiss.  *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).  A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).  Where a document is referenced in the amended complaint and central to plaintiff's claims, however, the Court may consider it in ruling on the motion to dismiss.  *Id.*  The Court may also take judicial notice of matters of public record.  *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

500 investors. Pursuant to the CPAs, investors paid an upfront fee that TGC would use "exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website." Doc. 29 ¶ 24. In exchange, TGC guaranteed investors a minimum rate of return in perpetuity on the revenue TGC generated from those websites. Typically, the return, paid monthly, was the greater of up to 20% of an investor's initial investment or 50% of the investor's designated website's revenue. TGC retained discretionary authority on how to invest the investors' money. In the CPAs, TGC also represented that it was in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties," as well as that it was "debt-free . . . with no accounts payable or loans outstanding." *Id.* ¶ 25.

Although TGC had much success generating investments, its advertised business model proved unsuccessful, with TGC failing to timely purchase and build the promised websites and generate the amount of revenue it had promised to investors. In addition to this revenue shortfall, TGC used investor funds to pay Courtright's personal expenses. Consequently, to cover the guaranteed returns and remain in business, all while funding Courtright's personal expenses, beginning at the latest in March 2015, TGC turned to a Ponzi scheme, paying early investors with money TGC raised from later investors. For example, between January 2017 and October 2019, TGC paid investors at least $30 million, but because investor websites generated only approximately $9 million in advertising and product sales revenue during that time period, TGC funded the shortfall through new investments. TGC also used loans from Heartland and distressed lending companies to help make up the difference. In December 2019, TGC placed a moratorium on investor payments. Ultimately, the majority of investors received less than they had invested or nothing at all.

## II.     Investigations into TGC and Courtright

On December 27, 2019, the SEC filed suit against TGC and Courtright, seeking to terminate the Ponzi scheme and freeze their assets. *SEC v. Today's Growth Consultant Inc.*, No. 19 C 8454 (N.D. Ill.). The court entered an order freezing assets, appointing the Receiver, and staying claims against TGC on December 30, 2019. The Receiver analyzed TGC's books and records. She found that, in 2018, TGC had under $2 million in website revenue but made approximately $12.7 million in payments to investors, with a total loss that year of $5.7 million. This trend continued in 2019, with TGC website revenue under $4 million, investor payouts of $16.5 million, and a $7.5 million loss.

In February 2020, the government filed a criminal complaint against Courtright, charging him with wire fraud. *United States v. Courtright*, No. 20 CR 77 (N.D. Ill.). Also in February 2020, several investors filed a putative class action complaint against Heartland and PNC, alleging violations of the FOA and related claims. *PLB Investments LLC v. Heartland Bank & Tr. Co.* (the "PLB Action"), No. 20 C 1023 (N.D. Ill.). The PLB Action is pending before this Court.

## III.     TGC's Banking Relationship with Heartland and PNC

### A.     Heartland

TGC had business bank accounts at Heartland, on which Courtright was an authorized signatory. Courtright also had a personal banking relationship with Heartland, and Heartland held a mortgage on his main residence.

Thomas Kentner served as the Heartland loan officer on all of Heartland's loans to TGC and Courtright. Kentner reviewed copies of CPAs, which indicated that investors provided funds solely for the purchase, development, and management of websites and that TGC guaranteed

payments to the investors in return. Kentner also reviewed TGC's and Courtright's financial statements. In at least one February 2014 personal financial statement that Courtright provided to Heartland, Courtright claimed ownership of the websites as a personal asset. The TGC statements Heartland reviewed demonstrated that TGC included pending investor payments in its accounts receivable and that investor payments outpaced advertising revenue.

Heartland also knew that Courtright paid his home mortgage with funds from TGC's bank account because Courtright established an automatic transfer from TGC's account to his loan account. Courtright also had asked Kentner about making payments beyond his monthly mortgage payments to pay down his personal debt and establish collateral in the house. Between January 2017 and October 2018, TGC transferred over $323,000 to pay down the mortgage on Courtright's personal residence, making weekly payments of $3,000 to the loan account despite the loan requiring monthly principal and interest payments of only $2,729. Courtright then used the equity in his personal residence as collateral for loans TGC received from Heartland to address its cash flow issues. Courtright also used TGC funds to pay personal expenditures, including school tuition and department store credit cards, with the September 30, 2016 ACH agreement TGC entered with Heartland listing Courtright's children's school, Macy's, and Nordstrom as authorized payees from TGC's account.

Heartland provided TGC with loans and lines of credit beginning in March 2015. In connection with extending financing, Kentner reviewed TGC's loan applications and analyzed its financial statements. In March 2015, Heartland extended a thirty-day loan to TGC for $66,886 to cover a cash flow deficit. In June 2015, Heartland approved a $90,000 thirty-day loan to TGC to cover another cash flow deficit. The following month, Heartland extended to TGC a $200,000 revolving line of credit to fund its accounts receivable, which Heartland renewed in July 2016.

In April 2017, having drawn down $180,000 of its existing line of credit, Courtright indicated he wanted to increase the line of credit to $500,000.

When the line of credit matured in August 2017, TGC sought its renewal and provided Heartland with its current financial statements. These financial statements showed that most of TGC's operating income came from investor fees, not revenue from the websites, and that the majority of its accounts receivable were investor payments. Heartland also learned in August 2017 from Courtright that TGC had recently switched accountants for performance-related issues and that the new accountants were in the process of updating TGC's 2016 and 2017 financial statements. Because Heartland "was not comfortable" extending TGC's line of credit for a full year without reviewing TGC's updated financials and future business plans, it extended TGC's line of credit for only three months. Doc. 29 ¶ 66. Heartland proceeded to renew the line of credit in three-month increments three more times while TGC updated its financial statements. Courtright provided TGC with updated CPAs, which reflected that TGC actually received a lesser percentage of website revenue than Courtright had previously represented to Heartland.

On August 7, 2018, TGC finally provided Heartland with TGC's updated balance sheets for 2017 and through July 2018. TGC's 2017 profit and loss statement showed it incurred more than $2 million in losses that year, with website and product revenue totaling less than $3 million, investor payouts totaling over $8 million, and investor income exceeding $16 million. The 2018 year-to-date profit and loss statement showed website and product revenue bringing in less than $1 million, investor payouts exceeding $6 million, and investor income again exceeding $16 million. After reviewing these statements, Heartland's Joe Brock spoke with TGC's controller on August 29, 2018. Brock noted that TGC's 2018 website revenue was on pace to decrease 74% while investor payouts increased by 36%. In response, TGC's controller

acknowledged that TGC used incoming money from new investors to make up any shortfalls in guaranteed investor payouts. Heartland's Kentner and Don Funk then met with Courtright on September 10, 2018 to further discuss Heartland's concerns with extending TGC's line of credit. At that meeting, Courtright acknowledged that TGC had used and would continue to use incoming investor funds to cover the shortfall between website revenues and investor payouts. Hearing this, Heartland determined it was "uncomfortable" with TGC's business model and decided to terminate its relationship with TGC. *Id.* ¶ 72. Heartland then terminated its banking relationship with TGC on September 14, 2018. Nonetheless, Heartland refinanced Courtright's mortgage loan on his personal residence in October 2018, and Heartland continued to accept payments of investor funds from Courtright and TGC for that mortgage loan.

### B. PNC

After Heartland indicated it would close TGC's accounts, TGC moved its bank accounts to PNC in September 2018. Deposits into TGC's PNC accounts reflected that the deposited funds came from investors to purchase websites, and PNC had possession of the CPAs. TGC also deposited almost $12 million in loan proceeds in its PNC accounts, commingling these loan proceeds with investor funds and instructing PNC to use the funds to both make payments to investors and repay its loans. Courtright also directed payment of his personal expenses, including his children's private school and college tuition, his tax and credit card bills, department store purchases, and personal mortgages held by Heartland, from funds in TGC's PNC account.

On September 19, 2018, two PNC representatives visited TGC's Lancaster, Pennsylvania office and met with TGC employees, including its controller and treasurer. Additionally, on September 26, 2018, Michael Postupak, a PNC senior vice president and relationship manager

for TGC, learned that Kerri Courtright wanted her personal bank account at PNC to automatically draw $2,500 from TGC's operating account any time her personal account balance dropped to $1,500.

PNC conducted a monthly "corporate account analysis" of TGC's account, charging TGC monthly fees that totaled $31,252.73 between November 2018 and December 2019 for this service. The corporate account analysis involved determining if TGC's "non-interest bearing, collected, demand deposit balances for the month (net of balances required to support account activity) are sufficient, as determined solely by [PNC], to offset that month's fees."[3] Doc. 48-3 at 6.

In response to TGC requests, PNC increased TGC's ACH exposure limits on four separate occasions.[4] As part of an October 22, 2018 credit approval memorandum, which authorized TGC's initial application for a $1.5 million ACH exposure extension, PNC noted its understanding that TGC entered into partnerships with investors to purchase and build websites, with TGC splitting profits with the investors.

On April 5, 2019, the SEC issued a subpoena to PNC requesting TGC documents. The SEC issued four additional subpoenas to PNC related to TGC on April 11, August 19, November

---

[3] The amended complaint asserts that the corporate account analysis involved "continuous and in-depth account review and analysis services," including reviewing TGC financials, business models, and marketing materials, from which PNC learned that TGC's revenue could not cover investor distributions and that instead TGC was running a Ponzi scheme. Doc. 29 ¶ 81. PNC's account agreement with TGC, however, contradicts the Receiver's allegations that the corporate account analysis involved such an extensive account review. Doc. 48-3 at 6. And while the Receiver objects to the Court's consideration of the account agreement at the pleading stage, because the Receiver predicates her claims against PNC in part on the corporate account analysis fee, the Court finds it appropriate to consider the document describing that fee here. *See Hecker*, 556 F.3d at 582–83.

[4] As set forth in PNC's account agreement with TGC, TGC's ACH limit was "the maximum dollar amount of accumulated ACH Credit Entries for which [PNC] ha[s] not received final payment from [TGC] and which, subject to these terms and conditions, [PNC] will process for [TGC]." Doc. 48-3 at 43. TGC also agreed "to have on deposit in the Account(s) on the Settlement Date sufficient available funds to cover the total amount of [its] Credit Entries." *Id.* at 42.

1, and December 3, 2019. Despite receipt of the subpoenas, PNC continued to accept deposits from investors. At least one of PNC's ACH extensions to TGC, which increased its ACH exposure limit from $1.5 million to $2.1 million, occurred after PNC learned of the SEC's investigation. PNC eventually stopped accepting investor deposits to the TGC account when the SEC filed its civil action against TGC in December 2019.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—

in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

## ANALYSIS

### I.      FOA

Heartland and PNC first argue that the FOA provides them with a defense to all of the Receiver's claims. The FOA is "meant to shift the burden of employing honest fiduciaries to the principal instead of the banking institution." *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill. App. 3d 759, 769 (2007). In other words, it provides a "total defense to banks for all claims arising from a bank's honest interactions with fiduciaries." *Crawford Supply Grp., Inc. v. LaSalle Bank, N.A.* (*Crawford Supply I*), No. 09 C 2513, 2010 WL 320299, at *9 (N.D. Ill. Jan. 21, 2010).

The Receiver contends that several sections of the FOA apply to her claims, all of which, with slight differences as to the type of transfer at issue, generally protect a bank from liability for the misappropriation of funds by a fiduciary unless the bank has actual knowledge of the misappropriation or knowledge of sufficient facts that its actions amount to bad faith. 760 Ill. Comp. Stat. 65/5, 6, 7, 8, 9. Consequently, a plaintiff generally may state a claim that the FOA allows only if it pleads "(1) that the bank had actual knowledge of the fiduciary's misappropriation of the principal's funds, or (2) that the bank had knowledge of sufficient facts that its actions in paying the funds amount to bad faith." *Time Savers, Inc.*, 371 Ill. App. 3d at 768. The Receiver need not plead evidentiary facts to avoid the FOA bar, but she must do more than merely use "the words 'actual knowledge' and 'bad faith.'" *Id.* Section 7 of the FOA further provides that a bank may be held liable if a fiduciary misuses funds to pay a personal debt to that bank, even absent the bank's actual knowledge of the misconduct or bad faith. 760 Ill.

Comp. Stat. 65/7 ("If . . . a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check."). The parties agree that Courtright misappropriated investor funds, including by making deposits to his personal accounts at both Heartland and PNC and using funds from TGC's accounts to pay his personal expenses.[5] Their dispute centers instead on whether the Receiver has adequately alleged that (1) Heartland and PNC had actual knowledge of Courtright's misappropriation of investor funds, (2) Heartland and PNC had knowledge of sufficient facts regarding Courtright's wrongdoing such that their actions amounted to bad faith, or (3) Courtright breached his fiduciary duty by using investor funds to make payments to Heartland on his personal debt. Heartland also argues that the Receiver must identify the specific transactions that violated Courtright's fiduciary obligations. The Court examines these arguments in turn.

### A.      Actual Knowledge

For purposes of the FOA, "actual knowledge" means "the awareness at the moment of the transaction that the fiduciary is defrauding the principal or having express factual information that funds are being used for private purposes that violate the fiduciary relationship." *Time Savers, Inc.*, 371 Ill. App. 3d at 768 (internal quotation marks omitted) (quoting *Cont'l Cas. Co. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 329 Ill. App. 3d 686, 703 (2002)). What Heartland or PNC should have known from the circumstances does not suffice; the Receiver must instead allege

---

[5] Heartland does argue that it did not know that the TGC accounts held fiduciary funds, although the amended complaint belies this argument given that it alleges that investor funds were specifically designated as such. Regardless, the relevant fiduciary relationship for purposes of this claim is that of TGC as the principal and Courtright as the fiduciary, not that of TGC or Courtright to the investors. Heartland does not dispute that Courtright owed a fiduciary duty to TGC, and so the Court does not discuss Heartland's argument further.

facts that give rise to the inference that Heartland and PNC actually knew of Courtright's misconduct. *Paloian v. F.D.I.C.*, No. 11 C 50017, 2011 WL 5325562, at *7 (N.D. Ill. Nov. 2, 2011).

The Receiver alleges that Heartland and PNC obtained actual knowledge of Courtright's misappropriation of investor funds from (1) the CPAs, which disclosed that TGC was to use investor funds to purchase, build, and maintain websites for the investors; (2) processing of investor funds; (3) processing of considerable payments for Courtright's personal benefit; (4) discharge of the banks' regulatory obligations; and (5) the extension of credit to TGC and Courtright, which provided the banks with detailed information on TGC's business and financial operations. Additionally, the Receiver alleges that Heartland gained actual knowledge by allowing Courtright to use TGC funds to pay his personal mortgage, which Heartland held. The Receiver claims PNC also gained actual knowledge by receiving SEC subpoenas regarding TGC beginning in April 2019 and charging monthly analysis fees for TGC's account. The Court has previously examined almost the same allegations in the PLB Action, concluding that the first five alleged bases, when taken alone or together, do not allow the Court to infer that PNC and Heartland had actual knowledge of the fraud. *See* PLB Action, Doc. 51 at 12–15. The Court finds that the same analysis applies to these five bases here.

Initially, "[m]ere knowledge of the fiduciary relationship is not enough to raise a duty of inquiry on the part of a bank." *Crawford Supply I*, 2010 WL 320299, at *7. Thus, the fact that Heartland and PNC knew that investors wired money into TGC's accounts does not provide a basis for inferring that Heartland and PNC actually knew of TGC and Courtright's misconduct, particularly where TGC did not use customer-segregated accounts. Although the Receiver further argues that the CPAs should have given Heartland and PNC notice that TGC was only to

use investor funds to purchase, host, maintain, and market the websites for the investors' benefit, the CPAs actually allowed TGC to use investor funds for a number of purposes so that commingling of funds and transfers from TGC's accounts for Courtright's personal purposes would not have set off red flags. *See Quilling v. Nat'l City Bank of Mich./Ill.*, No. 99 C 50412, 2001 WL 1516732, at *9 (N.D. Ill. Nov. 27, 2001) (agreement did not provide bank with knowledge about how funds were to be used because the agreement was "about as clear as mud," "confusing and convoluted," and "would not have made it obvious to National City that Benson was breaching his fiduciary duties by withdrawing funds from the account in violation of the agreement").

Further, the Receiver does not point to any duty the banks had to track every expenditure of funds in TGC's accounts, and the FOA does not impose a duty on banks to "cross-referenc[e] the accounts of all those who had dealings with the bank and acted as fiduciaries with their personal incomes and other assets." *Crawford Supply Grp., Inc. v. Bank of Am., N.A.* (*Crawford Supply II*), No. 09 C 2513, 2011 WL 1131292, at *8 (N.D. Ill. Mar. 28, 2011). Therefore, that Courtright made many transfers from TGC's accounts to his own personal accounts "does not, without more, give rise to the inference that a bank had actual knowledge of wrongdoing or bad faith," particularly because "there are many legitimate reasons why a fiduciary might frequently move large sums of money on behalf of a principal." *Crawford Supply I*, 2010 WL 320299, at *7 (collecting cases); *see also Beedie v. Associated Bank Ill., N.A.*, No. 10-cv-1351, 2011 WL 2460959, at *4 (C.D. Ill. June 21, 2011) (allegation that the fiduciary moved large sums of money from fiduciary account to his personal account did not provide a basis to infer that the bank had knowledge of the fiduciary's misconduct); *Setera v. Nat'l City Bank*, No. 07 C 2978, 2008 WL 4425446, at *3 (N.D. Ill. Sept. 26, 2008) ("The most the bank could be charged with is

knowledge that Jines was making frequent withdrawals from the MPI account.  This level of knowledge, however, does not amount to 'express factual information' that the funds were being used for Jines's private purposes[.]"); *Johnson v. Citizens Nat'l Bank of Decatur*, 30 Ill. App. 3d 1066, 1072 (1975) ("[T]here are many legitimate reasons why an agent and principal might engage in odd checking practices.").

The Receiver also briefly alleges that, in discharging their duties under federal regulations to know their customers and engage in due diligence to detect money laundering, Heartland and PNC should have discovered the fraud.  But the fact that Heartland and PNC discharged their regulatory duties does not show actual knowledge but only that they had procedures in place that could have uncovered misconduct.  *See Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (know your customer obligations could only support an inference of what a bank should have known, not what the bank actually knew); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 923–24 (W.D. Mich. 2010) (collecting cases rejecting arguments that a bank's anti-money laundering obligations support a finding of actual knowledge of fraud because such arguments "do nothing to prove actual knowledge, but assert only what the Bank should have known had it fulfilled its duties of investigation"), *aff'd*, 712 F.3d 917 (6th Cir. 2013).  Similarly, any general allegations about the extension of credit and financing to TGC and the banks' review of TGC's operations, business, and finances in connection with such financing suffer from the same flaws because they focus only on what Heartland and PNC should have known, not on what Heartland and PNC actually knew.  *See Crawford Supply I*, 2010 WL 320299, at *7 ("What LaSalle 'should have known' is not what matters, however.  What matters under the Fiduciary Obligations Act is what LaSalle actually knew.").

14

Thus, the Court turns to the Receiver's specific allegations as to each bank. With respect to Heartland, as in the PLB Action, the Receiver has sufficiently alleged that Heartland attained actual knowledge of Courtright's misconduct by September 10, 2018, when TGC's controller and Courtright admitted to Heartland that TGC was using incoming money from new investors to make up the shortfalls in guaranteed investor payouts. Such actions plausibly amount to a breach of Courtright's fiduciary duty to TGC, allowing the Receiver to proceed against Heartland for any improper transactions that occurred after September 10, 2018.[6]

The same cannot be said for the Receiver's claims against PNC, however. Although the amended complaint includes several allegations concerning how PNC obtained actual knowledge, the Receiver only focuses on PNC's receipt of the SEC subpoena in her response to PNC's motion to dismiss. Thus, the Court does the same here.[7] But the amended complaint does not plausibly suggest that PNC actually learned of TGC's or Courtright's misappropriation from the SEC subpoenas requesting information about TGC. Aside from alleging the dates of the subpoenas, the Receiver does not allege what information the subpoenas included that could have provided PNC with actual knowledge of TGC and Courtright's scheme. Instead, as PNC argues, because the SEC has broad powers to investigate potential past, ongoing, or future violations of the securities laws, *see* 15 U.S.C. § 77t(a); *Kokesh v. S.E.C.*, --- U.S. ----, 137 S. Ct. 1635, 1640 (2017), SEC subpoenas for documents suggest only that the SEC has begun an investigation into *whether* a violation has occurred, *see* SEC Enforcement Manual § 2.3.4,

---

[6] In its reply, Heartland argues that even if it obtained knowledge that suggested Courtright was engaged in a fraudulent scheme, it could not share this knowledge with investors. The Court fails to see how this new argument relates to whether the FOA bar applies to the actual knowledge prong at issue here.

[7] The additional facts concerning Heartland's termination of its relationship with TGC and Courtright, PNC's site visit, Kerri Courtright's automatic transfer request, the corporate account analysis fee, and ACH extensions nonetheless do not suggest PNC's actual knowledge, as the Court has addressed in ruling on PNC's motion to dismiss the amended complaint in the PLB Action. The Court refers the parties to that analysis for further details.

https://www.sec.gov/divisions/enforce/enforcementmanual.pdf. A *possible* violation of federal securities laws cannot satisfy the FOA's actual knowledge standard. *See Time Savers, Inc.*, 371 Ill. App. 3d at 768 (actual knowledge requires "the awareness at the moment of the transaction that the fiduciary is defrauding the principal or having express factual information that funds are being used for private purposes that violate the fiduciary relationship"). And while the Receiver contends that the Court can infer that PNC reviewed the documents the SEC requested in responding to the subpoenas and thus uncovered the fraud, this again only raises questions as to what PNC should have known instead of plausibly suggesting that PNC did know of Courtright's misappropriation of funds. Thus, the SEC subpoenas do not provide a sufficient basis for allowing the Receiver to proceed against PNC under the FOA's actual knowledge exception.

### B. Bad Faith

This does not end the inquiry, however, because the Receiver can alternatively avoid the FOA bar by alleging that PNC and Heartland had knowledge of sufficient facts regarding Courtright's wrongdoing that the banks' actions amounted to bad faith. Illinois courts have defined "bad faith" for FOA purposes to include situations "where the bank 'suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that [it] may avoid knowledge that the fiduciary is acting improperly.'" *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 50 (2005) (alteration in original) (quoting *Cnty. of Macon v. Edgcomb*, 274 Ill. App. 3d 432, 436 (1995)); *see also Time Savers, Inc.*, 371 Ill. App. 3d at 768 ("In determining whether a bank has acted in bad faith, courts will consider whether it was commercially unjustifiable for the payee to disregard and refuse to learn readily available facts such that it was bad faith to remain passive."). But a bank's negligence does not meet the bad faith standard. *Beedie v. Associated Bank Ill., N.A.*, No. 10-cv-1351, 2012 WL 13005591, at *6

(C.D. Ill. Aug. 30, 2012). The Receiver relies on essentially the same allegations of the banks' knowledge to alternatively argue that Heartland and PNC acted in bad faith. The Court addresses these allegations as they relate to each bank separately.

First, with respect to PNC, the amended complaint does not suggest that PNC had any motive not to investigate TGC or Courtright's actions. Unlike Heartland, PNC had only a depositor relationship with TGC and Courtright. Although the Receiver argues that PNC gave TGC preferential treatment by increasing TGC's ACH exposure limits, these extensions did not amount to a loan and so would not have given PNC a motive not to investigate. *See Crawford Supply I*, 2010 WL 320299, at *9 (no basis for an inference of bad faith where, among other things, the bank did not give the fiduciary "preferential treatment or assistance," the bank did not accept payments from the fiduciary to service his personal debt, and the bank did not have any "special insight into [the fiduciary's] income or his personal finances"); *cf. Crawford Supply II*, 2011 WL 1131292, at *6 (bank chose "to ignore [fiduciary's] breaches rather than lose his business"). Nor did the ACH extensions require further investigation by PNC given that TGC's requests for increases were "outwardly proper" and not "*per se* alarming," as PNC documented in the credit approval memoranda. *Prather v. Northbrook Bank & Tr. Co.*, 2021 IL App (1st) 201192, ¶ 40 (citations omitted). Further, nothing about the SEC subpoenas suggests that PNC acted in bad faith by failing to further investigate upon receiving notice of the SEC's investigation. *See Time Savers, Inc.*, 371 Ill. App. 3d at 768, 770 (bank did not act in bad faith where the plaintiff "did not allege any facts that indicate [the bank] *deliberately* failed to inquire further even if the transactions were suspicious"). Finally, contrary to the Receiver's allegations the corporate account analysis fee did not involve an in-depth review of TGC and Courtright's

17

finances, nor does the Receiver indicate what any such review would have revealed to warrant further investigation.

TGC and Courtright's misconduct was not obvious, particularly given the fact that TGC had ordinary and not customer-segregated accounts with PNC. *See Paloian*, 2011 WL 5325562, at *7 ("[T]he facts plaintiff alleges do not indicate 'obvious circumstances' that became so 'cogent' that Amcore acted in bad faith in failing to further investigate them." (quoting *Appley v. West*, 832 F.3d 1021, 1031 (7th Cir. 1987))); *cf. In re Peregrine Fin. Grp. Customer Litig.*, No. 12 C 5546, 2014 WL 4784113, at *7 (N.D. Ill. Sept. 25, 2014) (a bank's knowledge of a customer-segregated account from which it would be unlikely to have a large number of transfers to non-principal accounts suggested the bank's bad faith). And "[m]ere suspicious circumstances," like those alleged here, "are not enough to require the Bank to inquire." *Johnson*, 30 Ill. App. 3d at 1072. Therefore, the FOA bars the Receiver from proceeding on her claims against PNC.[8]

The analysis is different for Heartland, however, given its more extensive relationship with TGC and Courtright and its review of TGC and Courtright's financial documents. The Receiver alleges that Heartland became uncomfortable with extending additional funding to TGC in 2017 and asked for additional documentation as a result. Yet, despite this discomfort, Heartland continued to prop TGC up with short-term financing for over a year while waiting for TGC to provide revised financial statements instead of conducting an active investigation of its own. Heartland argues that its actions are the opposite of bad faith because it identified concerns and ultimately terminated its relationship with TGC and Courtright. *See Praither*, 2021 IL App (1st) 201192, ¶ 42 (no bad faith where bank inquired into suspicious transactions, warned the

---

[8] Because the Court finds that the FOA bars all claims against PNC, the Court need not address PNC's additional arguments for dismissal.

fiduciary that it would terminate its relationship with him if he did not find a third-party administrator, and filed a suspicious activity report upon receiving a subpoena for documents); *Quilling*, 2001 WL 1516732, at *9 (no bad faith where bank started investigating "[a]s soon as the slightest suspicion arose," even though "it took nine months and another letter . . . before [the bank] shut the account down"). But the Receiver's allegations here at least suggest that Heartland only took cursory steps to investigate while at the same time ignoring signs of wrongdoing and allowing TGC and Courtright to proceed with business as usual beginning at the latest in August 2017 and only ending upon Courtright's admission to engaging in a Ponzi scheme in September 2018.

Additionally, the Receiver's allegations suggest that Heartland had a financial motive to avoid digging deeper into TGC and Courtright's actions. Because Heartland had made loans directly to Courtright, a more fulsome investigation could have jeopardized the potential for repayment. *See Crawford Supply II*, 2011 WL 1131292, at *6 (bank chose "to ignore [fiduciary's] breaches rather than lose his business"); *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292, at *1, *4 (N.D. Ill. Sept. 5, 1996) (plaintiff sufficiently alleged bad faith where, among other things, bank executives socialized with the fiduciary, who was the township supervisor, and the bank had a strong financial interest in keeping the township's accounts with the bank). Combined with the fact that Courtright had transferred TGC funds into his own account at Heartland and used funds from TGC's accounts to pay his mortgage with Heartland, the amended complaint includes allegations of more than just suspicious circumstances or negligence. *See Falk v. N. Trust Co.*, 327 Ill. App. 3d 101, 103–04, 111–12 (2001) (the plaintiff sufficiently alleged a bank's bad faith by alleging that the fiduciary had transferred the principal's funds into her own account, the fiduciary used funds to pay a personal loan owed to

the bank, and the bank had reviewed the fiduciary's tax returns and other financial statements and knew she had insufficient income to support her account and loan activity); *Crawford Supply I*, 2010 WL 320299, at *8 ("The fact that the bank accepted checks drawn on the principal's account in payment of the fiduciary's personal debts owed to the bank was critical to the [*Falk*] court's finding [of bad faith] in that case").  Taken together, the Receiver's allegations against Heartland give rise to an inference of bad faith, allowing them to pursue their claims against Heartland under the FOA with respect to transactions occurring after August 2017.  *See Ohio Cas. Ins. Co.*, 1996 WL 507292, at *4 ("While probably none of the matters alleged, standing alone, would be sufficient to demonstrate bad faith, their totality raises enough of an inference of bad faith for pleading purposes.").

### C. Identification of Specific Transactions

Although the Receiver has pleaded Heartland's actual knowledge and bad faith, as required by the FOA, Heartland seeks to impose an additional requirement at the pleading stage, arguing that the FOA requires a plaintiff to identify the specific transactions involving violations of Courtright's fiduciary duties.  *Aguilar v. PNC Bank, N.A.*, No. 14-CV-985, 2015 WL 13375792, at *15 (E.D. Mo. Oct. 20, 2015) (considering Missouri's codification of the Uniform Fiduciaries Act and requiring that the plaintiffs "identify specific transactions where Plaintiffs' funds were misappropriated"), *aff'd*, 853 F.3d 390 (8th Cir. 2017).  But Heartland points to no authority that such specificity is required at the pleading stage, instead relying on cases decided at summary judgment.  *Id.*; *see also Buffets, Inc. v. Leischow*, 732 F.3d 889, 899 (8th Cir. 2013) (affirming summary judgment decision involving Minnesota's version of the Uniform Fiduciaries Act); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 993 F. Supp. 1159, 1161 (N.D. Ill. 1998) (finding a disputed question of fact at summary judgment where the non-moving

party identified specific improper transactions).  Without any Illinois precedent requiring a plaintiff to identify specific transactions at the pleading stage in order to avoid the FOA bar, the Court finds the Receiver's general allegations concerning Courtright's misappropriation of funds, as well as the specific examples of misappropriation she has provided, sufficient at this stage.[9]

## C.    Section 7

In response to Heartland's motion to dismiss, the Receiver points out that she may proceed against Heartland under § 7 of the FOA regardless of whether the complaint sufficiently alleges Heartland's actual knowledge or bad faith.  Section 7 of the FOA provides that a drawee bank is liable where a fiduciary makes a payment to the bank for a personal debt and breaches his fiduciary duty in doing so.  760 Ill. Comp. Stat. 65/7; *Mikrut*, 359 Ill. App. 3d at 49 ("Section 7, however, also provides that a drawee bank is liable if a fiduciary delivers a check made payable to it 'in payment of or as security for a personal debt,' and 'if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.'  Under this latter provision, plaintiffs must show that [the fiduciary] drew checks on the client escrow account in payment of or as security for a personal debt [the fiduciary] owed to [the bank]." (quoting 760 Ill. Comp. Stat. 65/7)).  The Receiver argues that because Courtright used funds

---

[9] The Court does not read the additional Illinois cases Heartland cited in its reply to require the identification of the specific transactions at the pleading stage instead of generally alleging that such misappropriation occurred.  *See* Doc. 65 at 8–9.  For example, in *In re Peregrine*, the court found the existence of a customer-segregated account supported a finding of bad faith; it did not address whether the plaintiff needed to identify any specific transfers that involved misappropriation in order to proceed. 2014 WL 4784113, at *7.  Similarly, in *Crawford Supply II*, the court did not consider the argument that a plaintiff must connect a bank's actual knowledge or bad faith to specific transactions.  2011 WL 1131292, at *5–10.  And in *Praither*, the court's focus again was on whether the plaintiff had alleged actual knowledge or bad faith at the time of the alleged improper transfers, not on whether the plaintiff must allege each specific improper transfer in a complaint.  2021 IL App (1st) 201192, ¶¶ 36–38.  Here, having found that Heartland acted in bad faith beginning in August 2017, any transactions Heartland processed after that point may support the Receiver's claims.

from TGC's accounts to pay his outstanding personal loan balances to Heartland, this provides

an alternative basis for liability.

Heartland again argues that § 7 does not apply because the Receiver has not identified the

specific funds Courtright used to pay his personal debt to Heartland. But, as already discussed,

this asks too much of the Receiver at the pleading stage, particularly given TGC's commingling

of funds, making tracing next to impossible. Additionally, Heartland argues that the Receiver

alleges that Courtright funneled the mortgage payments through his personal account, meaning

that the transactions fall under § 9 and not § 7. Although one paragraph of the amended

complaint does allege that Courtright transferred funds from TGC's account to his personal

account to pay his Heartland mortgage, Doc. 29 ¶ 98,[10] Heartland ignores the various other

allegations in the amended complaint that Courtright paid his mortgage through an automatic

transfer directly from TGC's account at Heartland to his loan account, *id.* ¶¶ 52–53. At this

stage, this suffices to provide the Receiver with an alternative basis to hold Heartland liable

under the FOA. And because the Court has found that the FOA does not bar the Receiver's

claims against Heartland, it proceeds to address Heartland's remaining arguments for dismissal.

## II.      Aiding and Abetting Claim

To state an aiding and abetting claim, the Receiver must allege that (1) Courtright

performed a wrongful act that caused injury, (2) Heartland was aware of its role when it provided

assistance, and (3) Heartland knowingly and substantially assisted the violation. *Time Savers,*

*Inc.*, 371 Ill. App. 3d at 772. Although Rule 9(b) applies to the circumstances surrounding the

alleged fraud involved, the Receiver may allege Heartland's knowledge generally. *Heffernan v.*

---

[10] In quoting this language in its reply, Heartland cites ¶ 29 of the amended complaint, which says nothing about any transfers from TGC's account to Courtright's personal account, instead of ¶ 98.

*Bass*, 467 F.3d 596, 601–02 (7th Cir. 2006); *Prestwick Cap. Mgmt. Ltd. v. Peregrine Fin. Grp., Inc.*, No. 10 C 23, 2010 WL 4684038, at *4 (N.D. Ill. Nov. 12, 2010).

Heartland does not dispute that the Receiver has sufficiently alleged that Courtright breached his fiduciary duties. Instead, Heartland challenges the second and third elements, arguing that the Receiver has not alleged Heartland's actual knowledge or substantial assistance. Allegations of bad faith or what the banks should have known do not suffice for purposes of an aiding and abetting claim. *See Zachman v. Citibank, N.A.*, 183 F. Supp. 3d 922, 924 (N.D. Ill. 2016) (failure to allege bank's actual knowledge of scheme was fatal to aiding and abetting claim); *In re Canopy Fin., Inc.*, No. 12-cv-04646, 2015 WL 3505010, at *7 (N.D. Ill. June 2, 2015) ("[A]nalysis of claims of aiding and abetting fraud and breach of fiduciary duty has consistently distinguished actual knowledge and participation from the 'should have known' state of mind, and has just as consistently held that the latter mindset is not actionable."); *Johnson v. Filler*, 2018 IL App (2d) 170923, ¶¶ 20–23 (complaint failed to meet knowledge requirement of an aiding and abetting claim where it implied that the defendant "did not know of any undue influence but would have found out if he had investigated"). But, as addressed above, the Receiver has sufficiently alleged Heartland's actual knowledge of Courtright's misconduct on or after September 10, 2018, satisfying the second element after this date.

As for the third element, allegations concerning Heartland's provision of routine banking services, such as following Courtright's instructions on transfers of funds or providing financing and credit to TGC and Courtright, can only rise to the required level of substantial assistance if Heartland actually knew that the transactions helped facilitate Courtright's breaches of his fiduciary duties. *See El Camino*, 722 F. Supp. 2d at 911 ("Ordinary business transactions that a bank performs for its customer can satisfy the substantial assistance element of an aiding-and-

abetting claim only if the bank 'actually knew that those transactions were assisting the customer in committing a specific tort.'" (citation omitted)); *Bane v. Sigmundr Expl. Corp.*, 848 F.2d 579, 582 (5th Cir. 1988) ("[R]outine extension of a loan does not amount to substantial assistance."); *Heinert v. Bank of Am., N.A.*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019) (routine banking services, "even where they are performed with 'atypical' frequency," do not support finding of substantial assistance), *aff'd*, 835 F. App'x 627 (2d Cir. 2020); *In re TelexFree Sec. Litig.*, 357 F. Supp. 3d 70, 76 (D. Mass. 2019) (provision of banking services, including effecting transfers and making payments, does not actively or substantially assist a fraud). Here, the Receiver alleges that, even though Heartland took steps to end its relationship with TGC and Courtright after September 10, 2018, transfers continued between TGC and Courtright's accounts and Heartland did not report its knowledge of the Ponzi scheme to investors. According to the Receiver, Heartland's inaction allowed Courtright to continue the scheme at another bank while paying down his obligations to Heartland with investor funds. These allegations at least allow for an inference that Heartland provided Courtright with substantial assistance in breaching his fiduciary duties on or after September 10, 2018.[11] *See Cagan v. W. Suburban Bank*, No. 90 C 5582, 1992 WL 80966, at *1–2, 6 (N.D. Ill. Apr. 15, 1992) (bank's actions constituted substantial assistance where, in addition to facilitating investments, it "remain[ed] silent despite its knowledge of the sham nature of these investments" and so arguably "fostered the entire scheme and kept the house of cards from collapsing longer than it otherwise might have");

---

[11] In its reply, Heartland raises the argument that it did not have a duty to notify third parties of potential fraud committed by its customers. Heartland waived this argument by only raising it in reply, particularly given its knowledge of the Court's finding that such allegations sufficed to allege substantial assistance in the PLB Action, with the likelihood that the same analysis would apply in this case. *See* PLB Action, Doc. 51 at 23. To the extent discovery provides Heartland with evidence supporting its argument that it did not engage in any activities that substantially assisted Courtright's misconduct, Heartland can raise such an argument in a motion for summary judgment, fully setting forth the legal and factual bases for its position in its opening brief.

*Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 29 (2003) (allegations that the defendant actively concealed information sufficed to suggest substantial assistance). Therefore, the Receiver may proceed on her aiding and abetting claim related to Heartland's actions on or after September 10, 2018.

## III.    IUFTA Claims

The Receiver also brings claims under Sections 5(a)(1) and 5(a)(2) of the IUFTA, which protect against "transfers with an actual intent to defraud and transfers which the law considers fraudulent (i.e., constructive fraud or fraud in law)." *Gen. Elec. Cap. Corp.*, 128 F.3d at 1078. Heartland challenges the Receiver's allegations as to both actual and constructive fraud.

### A.    Actual Fraud

For a fraudulent transfer claim based on actual fraud under Section 5(a)(1), the Receiver must allege that Courtright made a transfer to Heartland "with actual intent to hinder, delay, or defraud any creditor." 740 Ill. Comp. Stat. 160/5(a)(1). Heartland argues that the Receiver has failed to plead that Courtright acted with the required fraudulent intent when making loan payments to Heartland from TGC's accounts. The Court may infer fraudulent intent from the existence of a non-exhaustive list of "badges of fraud" set forth in Section 5(b) of the IUFTA. *Bank of Am. v. WS Mgmt., Inc.*, 2015 IL App (1st) 132551, ¶¶ 88–89 (citing 740 Ill. Comp. Stat. 160/5(b)). The Receiver does not point to any of these statutory factors, instead arguing that a presumption of fraud arises from her allegations of a Ponzi scheme. Indeed, courts have recognized that allegations of a Ponzi scheme sufficiently suggest a debtor's fraudulent intent at the motion to dismiss stage. *See, e.g.*, *Damian v. Courtright*, No. 21 C 1694, 2021 WL 3144447, at *2 (N.D. Ill. July 26, 2021); *In re Equip. Acquisition Res., Inc.*, 483 B.R. 823, 834 (Bankr.

N.D. Ill. Sept. 28, 2012);[12] *In re Lancelot Invs. Fund, LP*, 451 B.R. 833, 839 (Bankr. N.D. Ill. 2011). As in those cases, the Receiver has sufficiently alleged Courtright's intent to defraud or hinder creditors by making loan payments to Heartland far in excess of his monthly obligations from TGC's accounts in connection with his perpetration of a Ponzi scheme.[13]

Next, Heartland argues that Section 9(a) of the IUFTA provides it with a defense to claims under Section 5(a)(1) for any transfers it received in good faith and for reasonably equivalent value. 740 Ill. Comp. Stat. 160/9(a). Section 9(a), however, constitutes an affirmative defense, which the Receiver need not have anticipated in her amended complaint. *See In re Spatz*, 222 B.R. 157, 165 (N.D. Ill. 1998). Because the Receiver has not pleaded herself out of court with respect to this defense and Heartland only argues that the Receiver failed to allege sufficient facts to avoid the defense, the Court finds it premature to consider whether Section 9(a) protects Heartland from liability on the Receiver's Section 5(a)(1) claim.

### B. Constructive Fraud

Section 5(a)(2) provides for the avoidance of a transfer if the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer" and "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." 740 Ill. Comp. Stat. 160/5(a)(2). "[A] transfer lacks reasonably equivalent value if there is no or inadequate

---

[12] As Heartland points out in its reply, in *In re Equipment Acquisition Resources*, the court found that the complaint did not sufficiently allege a Ponzi scheme so as to allow the plaintiff to take advantage of the "*Ponzi* scheme presumption" of actual intent. 483 B.R. at 835. But here, Heartland does not take issue with the fact that TGC and Courtright engaged in a Ponzi scheme.

[13] Heartland also argues in reply that the Receiver has failed to tie each transfer to Courtright's fraudulent intent and has instead aggregated the transactions in one particular lump sum. Although the Receiver will have to provide such detail to succeed on her claims, at the pleading stage, the Court declines to dismiss the Receiver's IUFTA claim on this basis where she has sufficiently identified the transfers as Courtright's payments on his mortgage from TGC's accounts totaling $512,449.33.

consideration." *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947

(7th Cir. 2007). This fact-specific determination requires "determin[ing] the value of what was

transferred" and "compar[ing] it to what was received." *Barber v. Golden Seed Co.*, 129 F.3d

382, 387 (7th Cir. 1997); *Janssen v. Reschke*, No. 17 cv 08625, 2020 WL 1166221, at *4 (N.D.

Ill. Mar. 11, 2020) (in determining reasonably equivalent value, courts consider such factors as

"(1) whether the value of what was transferred is equal to the value of what was received; (2) the

fair market value of what was transferred and received; (3) whether the transaction took place at

arm's length; and (4) the good faith of the transferee" (citation omitted)).

Heartland argues that because TGC received reasonably equivalent value for the

payments it made to Heartland for Courtright's mortgage, the Receiver cannot pursue her

constructive fraud IUFTA claim. Specifically, Heartland argues that TGC made payments on

account of an antecedent debt it owed Heartland, which resulted in a reduction of TGC's total

outstanding debt to Heartland. *See B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 478 (7th Cir.

2005) ("Repayment of an antecedent loan comes within the 'reasonably equivalent value' rule.").

But this ignores the fact that the Receiver alleges that TGC made payments to Heartland for

Courtright's personal loan from Heartland, not for any debt that TGC owed to Heartland as a

corporation. *See In re Cent. Ill. Energy Coop.*, No. 09-81409, 2011 WL 3666611, at *4 (Bankr.

C.D. Ill. Aug. 22, 2011) ("As a general rule, a fraudulent transfer occurs when a debtor pays the

debt of another, when the debtor itself is not obligated on the debt."). In its reply, Heartland

contends that a debtor may receive reasonably equivalent value even when paying a third party's

obligation. *See In re Cent. Ill. Energy Coop.*, 521 B.R. 868, 872 n.3 (Bankr. C.D. Ill. 2014)

("Where a debtor pays an obligation of a third party, the debtor may receive reasonably

equivalent value if the debtor and the third party share an identity of interests or if the debtor

receives an indirect benefit with a quantifiable economic value."). Heartland argues that the amended complaint admits that the Courtrights were the sole owners of TGC and that their residence served as collateral for TGC's loans, defeating any argument that TGC did not indirectly benefit from payment of Courtright's mortgage. But this question involves a fact-specific determination not appropriate for resolution at the pleading stage. *See In re Mack Indus., Ltd.*, 622 B.R. 887, 894 (Bankr. N.D. Ill. Nov. 10, 2020) ("Though the general rule is that a debtor does not receive reasonably equivalent value by paying the debt of a third party, courts still examine the facts and circumstances to determine whether the debtor indirectly got reasonably equivalent value, such as through multi-party transactions."). At this stage, the Receiver has sufficiently alleged that TGC did not receive reasonably equivalent value for its payment of Courtright's personal liabilities to Heartland, allowing it to proceed on its constructive fraud theory under the IUFTA.

## IV.    Unjust Enrichment

To state an unjust enrichment claim, the Receiver must allege that Heartland has "unjustly retained a benefit to [the Receiver's] detriment, and that [Heartland's] retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs. v. Mt. Vernon Hosp.*, 131 Ill. 2d 145, 160 (1989). "A cause of action based upon unjust enrichment does not require fault or illegality on the part of defendants; the essence of the cause of action is that one party is enriched, and it would be unjust for that party to retain the enrichment." *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 864 (1998).

Among other things, Heartland argues that TGC's loan payments to Heartland did not unjustly enrich Heartland in any way. Heartland points out that the payments merely fulfilled Courtright's contractual obligation to repay money that Heartland had lent to him, with the

28

payments lowering the balance due on those loans. Courts have recognized that "repayment of a loan is not 'unjust' enrichment," even where the bank received the payment from a non-debtor, as in this case. *B.E.L.T., Inc.*, 403 F.3d at 477; *Eighteen Invs., Inc. v. NationsCredit Fin. Servs. Corp.*, 376 Ill. App. 3d 527, 536 (2007) (bank's retention of funds obtained through judicial sale of mortgage was not unjust where the defendant lent money and "foreclosed simply to receive back the money it was owed"); *Baron v. Chehab*, No. 05-3240, 2006 WL 156828, at *10 (C.D. Ill. Jan. 20, 2006) (no unjust enrichment where plaintiffs made the payments to the defendant bank on loans owed to the bank by related corporations). Therefore, the Court finds that the Receiver has not sufficiently alleged a viable unjust enrichment claim.[14]

## V.      Statute of Limitations

Separately, Heartland argues that the UCC's one-year statute of repose, 810 Ill. Comp. Stat 5/4A-505, bars all of the Receiver's claims based on wire transfers. Section 4A-505 provides:

> If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within one year after the notification was received by the customer.

810 Ill. Comp. Stat. 5/4A-505. Heartland argues that because TGC did not object to any transfers as unauthorized within a year after receiving notification of the transfers, the Receiver,

---

[14] Because the Court finds dismissal appropriate on this ground, it does not address Heartland's remaining arguments for dismissal, except to note that bankruptcy law may also preempt the Receiver's unjust enrichment claim. *See Grede v. FCStone, LLC*, 746 F.3d 244, 259 (7th Cir. 2014) ("To allow an unjust enrichment claim in this context would allow the trustee or a creditor to make an end run around the bankruptcy code's allocation of assets and losses, frustrating the administration of the bankruptcy estate under federal bankruptcy law."); *B.E.L.T., Inc.*, 403 F.3d at 477 ("Calling the receipt of a preference 'unjust enrichment' does not change matters; a preference by any other name is still a preference and cannot be recovered outside bankruptcy.").

standing in TGC's shoes, cannot object to them now. At least one court has found that this statute of repose "has no bearing on either the remedies or the applicable statute of limitations for a fraudulent transfer simply because the transfer was effectuated electronically." *Finn v. People Bank of Wis.*, No. 11-cv-322, 2012 WL 12995316, at *16 (W.D. Wis. Aug. 22, 2012). As Heartland points out, however, other courts have applied the statute to bar claims based on a corporate officer's fraudulent activity. Doc. 51-1 at 35 (collecting cases). Because the statute of repose is another affirmative defense the Receiver need not have anticipated, the Court need not resolve the parties' disagreement about its applicability at this time.

## VI.    Rule 9(b)

Heartland also argues that the Court should dismiss the Receiver's claims because she has not met Rule 9(b)'s heightened pleading standard with respect to her fraud-based claims. But Heartland demands too many details at the pleading stage, even under Rule 9(b)'s heightened pleading standard. The Receiver has sufficiently alleged the circumstances surrounding the alleged fraud with particularity, describing how Courtright and TGC, assisted by Heartland, pursued a Ponzi scheme by using investor money to pay prior investors' guaranteed payments as well as Courtright's personal expenses through Courtright and TGC's bank accounts located at Heartland from at least March 2015 through December 30, 2019. *See Damian*, 2021 WL 314447, at *3, 6 (finding similar allegations sufficient under Rule 9(b)). The Receiver need not identify who at Heartland allegedly knew about the scheme, given that a plaintiff may alleged knowledge generally, although the Receiver does at least name several individuals at Heartland who had knowledge of the scheme and involvement in Heartland's decisionmaking with respect to TGC and Courtright. *Id.* Nor does Rule 9(b) require the Receiver to identify each investor allegedly harmed by the Ponzi scheme. Although the Court expects the Receiver

to provide much more details to support her claims as the case proceeds, her allegations sounding in fraud sufficiently provide Heartland with the specific details required by Rule 9(b) at the pleading stage.

## VII.  Relationship with PLB Action

Finally, in an argument mirroring that made in the PLB Action, Heartland argues that the Court should dismiss this case in the interest of judicial administration.  Heartland argues that because both cases involve essentially the same issues of fact and law, only allowing one case to proceed would serve the purposes of judicial economy and prevent the risk of disparate rulings. Heartland also raises concerns that allowing both cases to proceed may give rise to a double recovery.  *See Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 422 (2002) ("It is well established that for one injury there should only be one recovery irrespective of the availability of multiple remedies and actions.").

Admittedly, this case and the PLB Action both raise claims against Heartland related to violation of the FOA and aiding and abetting Courtright's breaches of fiduciary duty, with the allegations against Heartland essentially the same in both cases.  In this case, however, the Receiver brings additional claims that the plaintiffs in the PLB Action have not raised. Heartland also ignores that this Court is presiding over both cases and has indicated that the cases will proceed on the same track.  This minimizes concerns about judicial economy and inconsistent rulings.  The parties and the Court can work together to ensure that these cases proceed together as efficiently as possible.  Similarly, the possibility of a double recovery if this case proceeds alongside the PLB Action is entirely hypothetical at this stage and does not provide a ground for dismissal at the pleading stage.  As the Receiver points out, if this case proceeds to the damages stage, various mechanisms exist to ensure that no one obtains a double

recovery.  Ultimately, Heartland has not identified a valid basis for dismissing this action based on the related PLB Action.

## VIII.   Dismissal with Prejudice

Although the Court typically would provide the Receiver with an opportunity to address the deficiencies identified in this Opinion, the Court finds that, in this specific case, providing the Receiver with leave to amend her claims against PNC would be futile.  Initially, the Receiver did not request leave to amend if the Court granted PNC's motion.  *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1008 (7th Cir. 2019) ("A district court does not 'abuse its discretion by failing to order, *sua sponte*, an amendment to [the complaint] that [the plaintiff] never requested.'" (alterations in original) (quoting *Wagner v. Teva Pharms. USA, Inc.*, 840 F.3d 355, 359 (7th Cir. 2016))).  Moreover, the Receiver had the benefit of the Court's analysis of the sufficiency of the plaintiffs' claims against PNC in the PLB Action, PLB Action, Doc. 51, and amended her complaint to add additional allegations in an attempt to overcome the Court's analysis. Additionally, in her role as Receiver, she has reviewed substantial discovery involving TGC and Courtright, including the documents PNC produced to the SEC in connection with its investigation.  Yet, even having reviewed this discovery, her allegations do not suffice to overcome the FOA bar.  Thus, the Court concludes that further amendment would be futile and so dismisses the claims against PNC with prejudice.  *See Anderson v. Deutsche Bank Nat'l Tr. Co.*, No. 14 C 5474, 2014 WL 6806891, at *2 (collecting cases).

As for the claims against Heartland, the Court dismisses the breach of fiduciary duty and aiding and abetting claim with respect to actions that occurred before September 2018 with prejudice for the same reasons.  But because the Court has not previously addressed the unjust enrichment claim in connection with Courtright's misconduct, the Court will dismiss that claim

without prejudice, providing the Receiver with one additional opportunity to cure the deficiencies identified by the Court here.

## CONCLUSION

For the foregoing reasons, the Court grants PNC's motion to dismiss [46] and dismisses the Receiver's claims against PNC with prejudice. The Court grants in part and denies in part Heartland's motion to dismiss [49]. The Court dismisses the Receiver's claims against Heartland for breach of fiduciary duty (Count II) and for aiding and abetting breach of fiduciary duty with respect to actions that occurred before September 10, 2018 (Count III) with prejudice. The Court dismisses the Receiver's claim against Heartland for unjust enrichment (Count VI) without prejudice.


Dated: December 15, 2021

SARA L. ELLIS
United States District Judge